The case for today is 2017-30769 Pan American Life Insurance Co v. Louisiana Acquisition Court. Good morning. Good morning. I'm George Fowler. I represent Pan American, the appellant. This case needs reversal. You know, before I argue before the Fifth Circuit, normally I argue in New Orleans where I hail from, but I always read the instructions. The instructions always tell me, don't talk about the facts. The judges know about the facts. And I know you do. But I have nothing else hardly to talk about. There's no law in this case. This is a four-year, heavily contested case. And I was ready to go to jury trial, and I asked Judge Zinni many times to let me go to jury trial, but I never got my day in court. He did a little bit of a Merlin de Magician with a wand and just resolved all factual issues in a jury case, even when there were ambiguities, and decided against my client. What about if there are, I mean, there was a richness in two very different fact narratives about divestiture, got to sell it, or fraud, mismanagement, coercing your client to sell. But before you get to any of that, if your client wrote an unambiguous release, I thought it doesn't seem to be so much of a factually complicated issue as to that language. No, it's not factually. And I gave you some documents, Judge. I think the first one should be what they call the release language. Are we, this is, you put this up here for us? I put this up together. Did you show the other side of this, and they agree that this is accurate in the record? We got it at the same time you did. Okay. Okay. Well, what it is, is at the top, it's got the language of the side letter agreement, and it's on the left-hand side, it's got the language on the Judge Zaney's decision on the motion to dismiss, which was the first decision. And I urge you to read that, because it is a very good decision. And in that decision, he didn't find there was any ambiguity. He said that there was a commitment to do something in the future. But ultimately, after the purchase agreement, and we sold the hotel for a lot less than it was worth, because they gave us that release language. I have to stop you with one threshold question. Sure. When you say we sold. Pallack. Pallack. But part of the difficulty for me reading this record in the brief is, you also were counsel for the partnership. In the sale. Only in the sale. So the emails and the issues that we've got have you representing the partnership, have you representing one partner against the other, and now here you are before us. You don't see any conflict of interest in terms of your representations as to resolving this issue? No. Because I researched it before. And under Louisiana law, a partnership is a separate juridical entity. And our entire role in connection with the sale of the hotel was we represented Panacon and it was basically an issue of sale documents. But I was advising Pallack on the controversies between the parties, which at the beginning we didn't know. But so at the same time you're advising one partner against the other, you are also counsel for the partnership as to the sale. Just as to the sale. Okay. And I have the right to because I'm a two-thirds owner of the hotel. So it's... When you say I'm a two-thirds owner, what do you mean by that? I'm sorry. I keep... Pallack. Pallack. Okay. Go ahead. Pallack is two-thirds. LAC or Intercontinental is one-third. So back to paragraph six. So you go to paragraph six and read what Judge Zaney said. And he didn't find it ambiguous. He found it, okay, the problem with this document to support the dismissal of my client is simple. My client didn't give at any time any release. It talks about a future commitment to do something as exactly what Judge Zaney said in that language. So he... They agreed to do something. But the only... After the closing, the only thing we got, the only thing we got was a voluntary termination agreement signed by... The Pentagon had to sign. So either they forgot or didn't do it or thought that the voluntary termination agreement of the management agreement was the only document they did. I don't know. I wasn't their lawyer. You know, we were... Pallack never signed, and that's what Judge Zaney said, Pallack never signed a release. Never to this day. So at no time have we ever been given a release for Pallack to sign. But it says Pallack and LAC agree, present tense. So it's, right, future conditional, sentence before, then here we agree to do the following. We're going to pay close to half a million. Why isn't that crystal clear? This is the release. It's... We have one sentence followed by another, that this is the present tense agreement. Well, because ultimately, it was according to Judge Zaney and according to us, it was an agreement to do something in the future. Let's see if I can read. Well, Judge Zaney did keep saying stop referring to that. That was at the motion to dismiss stage. So it's just your best argument that the present tense statement, we agree to resolve it for this amount. Where's the ambiguity in that? We agreed to resolve for that amount. Yeah. The case is a $60 million case. Four years in litigation. It's a $60 million hotel sale, but that isn't necessarily... No, no, no. No. No? Our claim is for $60 million, okay? They got... The hotel was sold for $20-some million less than what it should have been sold for. I thought it was sold for $60 million. It was sold for $60 million. You're right. But... Sorry. Okay. They got a franchise agreement, a $20 million franchise agreement. They thought they owned the hotel 100%. They could do anything with the hotel if they wanted to, you know? And they could put a franchise... So they got a franchise agreement. They put a gun to our head. This release language came in two days before the closing. So we had to move. We had to decide what we were going to do. But... So the deal was almost done, but they were getting a franchise agreement, which only they get the money. And it's a great deal. It's a new deal by hotels like Intercontinental, which is the largest hotel chain. Your brief did keep saying, gun to your head. I just don't see the relevance of that. They may have said to you at the last minute, you should look at our books. This is a number you're agreeing to. Free and clear. Equal in both ways. All right, but... But let me finish my point. Yeah. So we have two business entities that have been sort of in a bed, even if antagonistic to each other, for decades. You're a powerful corporate entity. They say, this is what we think we need to have for release. And it's at the last minute. But what's the relevance of that? You could have said, okay, we'll hold off the sale. We don't like to. Well, show me where it says that Palak released anybody. Palak didn't release anybody. Well, I've told you the language that looks to me like a present tense agreement. I'm asking you, when you say someone put a gun to your head, I don't see the relevance of that flavoring. You had an opportunity to say no. Well, but you know, I would like to present that to the jury. I know. Okay, that's fair. You know, I know you've got an opinion. Judge Zaney had an opinion. No, I'm trying to extract and test the arguments. I don't have an opinion yet. I understand. So, under your theory of the case, what is the purpose of the payment of over $434,000 if it's not in resolution of outstanding disputes and the release of LAC? It is in connection with the – we found in the days before the closing that they had siphoned off money in the form of charges, intercompany charges. So, my – one of my board members, Pat McElnice, brought it to their attention and said – and then they started it and sent a video presentation saying, no, it's not – he thought it was $2.7 million. No, it's not. It's only $400,000, and you've got to give us a release for everything for the $400,000. So, we looked at this document, and we did not think that this document – just like Judge Zaney said at the beginning, you know, he said that this was not ambiguous and that there was no release, and there is no release. His only release is for panic money. You know, Judge, sometimes when you're trying to do bad things, you know, you say, you know, two days before they gave us – and their release was for fraud. In other words, we were having a business – they're a huge hotel chain. Our company was making $23 million. We're a life insurance company, and they gave this to us, and they said, and you have to release this for fraud. I'm going, you committed fraud? And later on, that's what the lawsuit is about. It proves that they committed fraud. I'm sorry. I'm very dry. Well, the fraud issues in the end weren't released, right? Your argument is there's – regardless, there's fraud in the inducement even if we find a release. That's correct. Okay. Even – And the fraud is they hid the considerably higher charges. And they didn't disclose all the renovation. Yeah. When we did discovery, when we did discovery, we realized that there was some overcharges. But that's just a little small part of this case, by the way. Yeah. And then we – they said, no, absolutely, this is it. So, okay, we're going to sign this thing for the intercompany charges, not entirely for everything. Again, I repeat to you, Pallack doesn't appear anywhere in this release. You know, as a – If we accept that you're right that it's unclear, it – look, the – even the emails that you describe in the reply brief look like it was very obvious Pallack thought, we've got to sell this hotel and therefore we're going to have to sign a release. I mean, that is – the email – So your response to that is Abbott and they're privileged and they shouldn't have been looked at. For starts. Okay. For starts. Yeah. I mean, these are emails that I'm advising my client, you know, about how to handle the situation. You're advising one client. I'm advising – I'm not advising Panacon. All the emails that I was forced to produce and I sent a young lawyer to argue it and he – they gave him three minutes to answer it. There were a lot of motions. But you aren't – you've embraced the Abbott district court opinion. You've embraced that. You're not saying your lawyer and the district court made an error of law on this. No, my lawyer didn't make any error of law. If it's partnership material, the law would suggest that either partner gets access to it. Either partner. And we produced those – all those documents. And my point is, now that we're looking at those documents, it seems to support to me that absolutely a release was contemplated. You – No? You are – My – the emails, perhaps. I can't – I'm reading the first email you put in the reply brief. You – helpfully, you give at least seven or eight. The very first one speaks about a release. So when your brief states there was never a release, that's hard for me to accept. Let me – let me say this. The ones I'm complaining about are the ones that I argued. I mean, that shouldn't have been produced. And the magistrate said, you have to reduce all the documents. Not only ones where you communicate with Pentacon, but also – also all – all your internal emails with Palin. Okay? So I produced everything. And I had no choice. They held me – my – my – my – my firm contempt if I didn't produce it. I was fighting really hard. I sent different lawyers, hoping different lawyers might get me a different outcome. There were many motion after motion after motion. Figured one of these guys, they're going to like. And so – and they did. I mean, they – but they ultimately – the magistrate said, nine months, I looked at 30 documents and said, you have – you have to produce them. But I'm trying to – the distinction I'm trying to make to you is, yes, I knew they wanted a release. They don't want to pay a penny. They wanted to defraud us. They wanted to commit all these acts again. They want to siphon the money from us. I made a – it's a 60-page complaint with 124 paragraphs. It was very detailed. They wanted to be released from all that for the payment of $456,000. You know what they should have done? Just like the voluntary termination agreement says Panacon will release, they should have said Pallack releases in a separate document, as is contemplated here. As Judge Zane said, they agreed to do something in the future. But you know what? It's like I say, when you try to do bad stuff, sometimes things fall through the crack. And in this case, they fell through the crack. And they never gave us the release. This is what I'm saying. And so – but then I go to what's next? I mean, so the judge first says there's no ambiguity. Very well-written opinion, by the way. And he says, there's no ambiguity and there's no release by Pallack. There is a commitment to do something in the future. And that's it. That's it. Okay, good. No, no, no. It's up to the presiding judge. Did you have a question, Judge Dickinson? No, no, no. Okay. Your time has expired, sir, and you've saved time for rebuttal. Thank you. Thank you very much. Thank you. Good morning, Your Honor. Nancy Deegan and Matthew Wolfe for LAC-NIHC. I'm going to start with the document that has been provided to the court this morning. It was only after we saw the document going to the docket clerk and being presented on the bench that we realized we were missing something. But paragraph six is essential to everything. That's in the briefs. No one has any doubt about paragraph six. Paragraph six is essential to everything and we don't have a problem with paragraph... It's all over the record. Yes. The side letter agreement is in this record. You're prepared to talk about paragraph six. Many times. What I do have a problem with is the part of the document that talks about the court's initial interpretation of the agreement because there's a very important set of ellipses here where it says this of course is supportive of Palak's contention that the side letter agreement itself does not contain the actual release because the voluntary termination agreement which Palak did not sign contains the release ellipses. The breadth of the compromise presents mixed questions and this is on a 12b6 but what's contained in that ellipses that's missing from what the court was presented with today is where it says and it is clear that certain types of fraud claims are accepted from the release. On the other hand Palak did receive $434,636 referenced in paragraph six of the side letter agreement so it is clear that Palak compromised something so the court is saying on a 12b6 motion I see that something was compromised but I can't decide it at this time go do discovery parties and we did. So is it your position I'm sorry so is it your position that the district court didn't change its mind but that it just had to wait for the discovery exactly so Palak has chosen to characterize Judge Zaney's 12b6 opinion as a favorable opinion and has even told this court that Judge Zaney held that there was no release Judge Zaney did not hold that there was no release and in fact in his August 21st 2017 opinion which disposed of the remaining claims took Palak to task for repeatedly mischaracterizing his opinion he says in defense of LAC's motion for summary judgment and they were cross motions for summary judgment where both parties said that the documents were unambiguous a very very important point that my opponent failed to point out but in defense of LAC's motion for summary judgment Palak characterizes the foregoing language from the court's opinion as a holding that the SLA the side letter agreement does not contain a release this mischaracterizes what the court stated the court was explicit in observing that Palak did compromise and therefore release something because after all LAC did not did pay and Palak did accept the $434,636 payment described in paragraph six which brings me to my next question what is the limit of the compromise in the side letter agreement in your client's view the side letter agreement compromised everything your honor and it is clear from the language of the side letter agreement that it compromised all the claims that were brought in this litigation and Judge Zaney so held and the language upon which I rely I'm sorry Judge so do you mean including the prescription of renovation related fraud claims it doesn't compromise that does it that's a kind of dangling LAC prescription of renovation related fraud claims the renovation related fraud the renovation claim is first of all a partnership claim Panacon was the partnership of which the parties were partners right so it's not compromised by this it's separate it was indeed because it was the topic and let me tell you why your honor the renovation claim is a matter that was referenced in the agreement that was agreed to sell the hotel LAC wanted to continue to manage the hotel the parties to the management agreement were Panacon and LAC so when and of course LAC thought it would be foolhardy for the partnership to pay six million dollars in renovation when the brand didn't know if it was going to be an intercontinental because the management agreement was going to expire so they put it in default the renovation April 27 April 26 letters dangles the franchise agreement says we've had people come and ask us to sell the hotel and they're willing to do it with a franchise agreement we still wanted to manage the hotel the default occurred and then they withdrew it when we didn't   it was going to expire so it clearly references these letters the default letter so it includes this renovation issue but it also does speak about the future tense in the sentence before the agreement with the resolution for half a million it talks about would be and how does that make sense particularly I think you must know the emails very well some of them seem to contemplate future so it talks about two separate agreements there is the partnership agreement which is the rights and obligations of Palak as the majority partner and LAC and separately Panacon and LAC were the side letter agreement is between the partners the voluntary termination agreement is between the partnership and LAC as the manager but more importantly those future things that are referenced in paragraph six happened the Panacon side signed the voluntary termination agreement which wrapped up the voluntary termination agreement which wrapped up the management agreement before the sale all that happened the money was paid and in judge Zaney's opinion he said to the extent that you continue to rely on this concept that there was something that was going to happen in the future it happened you got the money you got the termination of the management agreement so that that was the consideration that was paid and let's talk about what the elements of a compromise are under Louisiana law a party need only show mutual intent of preventing or putting an end to litigation and reciprocal concessions the LAC surrendered its right to manage the hotel it could have continued to manage the hotel through December 31st 2013 and possibly thereafter under a right of first refusal in addition Palak got $446,000 so the elements under civil code article 3071 and 3079 were satisfied so there was clearly a release but if there were any question about whether this was a release we need only look at those emails because Palak and the lawyers refer to this 34 times as a release they talk about the fact that it is a complete release could you just mention quickly what your understanding of Louisiana privilege is in the context of a lawyer representing the partnership and the partners well there was a lot of litigation over that is there an easy synopsis a partnership cannot excuse me an attorney cannot represent another party when his ability to represent that other party would be in some way impaired by his representation of another party and here certainly the case of Palak and we took the position and also under Louisiana law of course if one partner has access to partnership records the other partner gets access to and that was the basis for and the Abbott case that was referenced by Judge Knowles that was the basis there were six different motions about these emails and of course it wasn't the lawyer who was arguing as my opponent would have the court to leave Palak absolutely refused to comply with the orders of the court and on the sixth time Judge Knowles was pretty frustrated it had already gone up to Judge Zaney come back and in fact Palak was sanctioned for the fees and costs of the final motion now Judge Zaney excuse me Judge Knowles did not lightly let us have these emails he did an in camera inspection for nine months before these emails were produced okay counsel can I ask unless there is something super important was that an answer to Judge Higginson or beyond that I was moving on I have several questions that I want to make sure we have time to get to yes did the district court dismiss this claim or grant a summary judgment on the breach of partnership agreement did the court dismiss or grant summary judgment on the breach of partnership agreement I totally understand why there might be some concern on the motion to dismiss Palak was raising claims that were the claims of Panacon so the court dismissed any claims that Palak raised by Panacon determining that Palak did not have standing separately Palak urged that there was a breach of the partnership agreement by LAC the parties filed cross motions for summary judgment they were extensively briefed and judge Zaney determined that there was no breach the next question I have has to do with the fraud in the side letter agreement why didn't Palak receive the monthly statements of the intercompany charges according to the record well Palak was the 66 and two thirds partner and Palak kept the partnership records Palak had internal and external auditors that reviewed compliance with the management agreement so did Palak's auditors receive the monthly intercompany charges one would assume the auditors would have brought that up but in any event when Jerry the partnership and it's important to note that that's a Panacon issue that the partnership had been charged certain disputed charges LAC went back and convened a group of knowledgeable parties to look at the issue and it was great area because this was an old management agreement that was confected in 1981 in 1981 hotels weren't dealing with things like green initiatives or internet charges or in room video charges things like that so there were various charges to Panacon that hadn't been envisioned at the time that the management agreement had been executed so that's why they had to assemble a team and figure out if this management agreement were being confected today is this something that we would have charged the partnership who owned the hotel and it took them three months and part of their argument is then two  years later LAC wanted a complete release for itself and any affiliates and it is indisputable that LAC offered to provide all the backup data that Palak may want we know that because Mr. Carlisle made what he said were contemporaneous notes of a conversation with LAC's representative and that's in the notes and it's indisputable that Palak through Mr. Carlisle knew that there might be things out there that Palak was being asked to release because in those allegedly contemporaneous notes Mr. Carlisle says I asked Joel, Joel are you saying you won't sell the hotel unless we execute this release? This makes me a little nervous because I don't know what we're releasing and that Mr. Eisman and Joel Eisman allegedly said yes that's right and then Mr. Carlisle said I don't like it but we're not going to jeopardize the sale of the hotel. So they had the opportunity and no one asked. They could have delayed the sale of the hotel. They could have gotten on a plane or asked the documents. I asked in the deposition did you ask anybody to email you the underlying data? No. Did you ask anybody to even provide it? And they said we don't need all that. It's not worth our time. We're not going to sue you. All of this is in the deposition. They were high fiving  fact that they were getting this $446,000. You're not relying on the principle of Louisiana law that says there's no fraud in the inducement if you could ascertain the truth without difficulty. You're not relying on that. I thought your argument was they're going to do it anyway even if it is somewhat difficult. Well, there's no reliance on any representation or alleged misrepresentation because they wanted to just go forward with the sale of the hotel. The point is they want to go forward anyway. Not that they could have easily discovered. You're not relying on the principle of Louisiana law that  there's no     could ascertain the truth without difficulty. They weren't relying on it anyway. There's another reason that there's no fraud in this  Mr. Revelta was a chief investment officer in his deposition. All of this is in the record. He was in charge of the hotel before Mr. Carlisle stepped in. Are you saying that there was fraud, Mr. Revelta? No, I am not. So there are admissions in the record that even Palak did not think that there was any fraud. Fraud has been part of the litigation narrative that was basically as Judge Zaney put it and he put it right there in his August 21st 2017 ruling. Palak has used this litigation to seek vindication over numerous points of disagreement between Palak and LAC during the course of their years long relationship. That is what this case is all about. This case should never have been brought because of the side letter agreement. To resolve this case and this is hypothetically assuming arguendo that we were to conclude that this was not ambiguous and therefore there was no peril evidence comes in then we don't have to get into whether or not there was confidentiality that was overcome by  side letter agreement. Then we resolve fraud and inducement on the prescriptive period. You don't need the documents to say they would have gone through anyway. Do you need the documents that they were going to go through come high water or whatever? We went without the documents. You don't need the documents. In addition to prescription, in addition to the side letter agreement, Judge Zaney said there was a complete absence of evidence under rule 56 on the claims that were raised in this lawsuit. Thank you, counsel. Thank you. I don't agree with most of what you said. We didn't think you would. But she read the ellipsis material correctly, the material you admitted in this. You don't dispute that it says on the other hand it is clear something. Is that in the letter on the left-hand side of the bottom? Is that correct? I will read it to you. Before I read this, let me say one thing. There were hundreds of issues of fact. We didn't agree on anything. We were ready to try this case and win this case. I'm going to   to you. Do you disagree with the language she said fits into that ellipsis? Do you disagree with what she read verbatim to us as the language that should be in that insertion? She said it says on the other hand it is clear  Is that what we have? Yes, that's correct. Everything that is put here is on the top. While we are talking about this document, it is not appropriate to give a document to the court without showing it to the opposing counsel before that time period. Just as you would not be allowed to do that in trial, you certainly cannot do it. In fact, we are supposed to be relying on the record that is here in the case already. If you have an extra document that you believe in, you cannot give it to the court without showing it to the opposing counsel before that time period. It is not appropriate it to   counsel before that time